IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JESSICA ADAMS,

    Plaintiff,

    vs.                                No. CV 18-925 KG/GBW

C3 PIPELINE CONSTRUCTION INC.;
ALPHA CRUDE CONNECTOR, LLC;
PLAINS ALL AMERICAN PIPELINE, LP
as Successor in Interest to Alpha Crude
Connector, LLC; PLAINS ALL AMERICAN
GP, LLC as Successor in Interest to Alpha
Crude Connector, LLC; PLAINS GP, LLC as
Successor in Interest to Alpha Crude Connector,
LLC; and PLAINS PIPELINE, LP, as Successor
in Interest to Alpha Crude Connector, LLC,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants Alpha Crude Connector, LLC,

Plains All American Pipeline, LP, Plains All American GP, LLC, Plains GP, LLC, and Plains

Pipeline, LP's (collectively, "the Plains Defendants") Motion for Summary Judgment (Motion),

filed October 10, 2018. (Doc. 6). Plaintiff Jessica Adams filed her response in opposition on

November 16, 2018, and, in the alternative, a Federal Rule of Civil Procedure 56(d) affidavit

stating that Adams lacks sufficient facts to adequately respond to the Motion and seeking

discovery. (Doc. 13). The Plains Defendants filed their Reply on December 3, 2018. (Doc. 14).

Having considered the briefing, the record, and the applicable law, the Court grants the Plains

Defendants' Motion for Summary Judgment (Doc. 6), enters judgment in favor of the Plains

Defendants, and dismisses all claims against the Plains Defendants with prejudice.

I.       Procedural History and Material Facts

This litigation results from alleged sexual harassment and other intentional torts directed at Adams by Mike Carrithers (Carrithers), Danny Robertson (Robertson), and Craig Arnault (Arnault) between fall 2015 and June 2016, and again between August and September 2016. (Doc. 1-1). Defendant C3 Pipeline Construction Inc. (C3) employed Adams as a pipelayer in the northern Delaware Basin in southeastern New Mexico. The Plains Defendants contracted with C3 as part of the Plains Defendants' enhancement of the Alpha Crude Connector to increase its barrels-per-day capacity. (Doc. 7) at 3 (Undisputed Material Fact (UMF) 5); (Doc. 13) at 6 (not contesting UMF 5). C3 also employed Carrithers, Robertson, and Arnault, who were, at various times, Adams' supervisors. (Doc. 1-1) at ¶ 14. C3 was one of multiple subcontractors contracted by the Plains Defendants, then operating as Alpha Crude Connector, LLC, to work on the 515-mile Alpha Crude Connector pipeline enhancement project. (Doc. 7) at 4 (UMFs 10, 11); (Doc. 13) at 7 (not contesting UMF 11, agreeing C3 was a subcontractor for the Plains Defendants).

C3 and the Plains Defendants used a Master Services Agreement to govern their relationship. (Doc. 7-4). The Plains Defendants assigned tasks to C3 and other subcontractors, and contracted with a third-party group of inspectors to ensure the work was done to the Plains Defendants' specifications. (Doc. 7) at 5 (UMF 25). However, the Plains Defendants did not pay any salary, wages, leave, or fringe benefits to employees of the subcontractors. (Doc. 7) at 5 (UMF 22). Nor did the Plains Defendants specify work hours, leave, or the conditions of employment for the subcontractors' employees, meaning that the Plains Defendants did not have the right to hire or fire those employees. (*Id.*) at 5 (UMF 23).

On August 30, 2018, Adams filed Plaintiff's Original Complaint for Sexual Harassment, Common Law Tort Claims, and Quid Pro Quo Treatment in the Workplace (Complaint) in the First Judicial District Court for the State of New Mexico, D-101-CV-2018-02553. (Doc. 1-1). Adams brought claims against the Plains Defendants and C3 for discrimination and retaliatory employment practices prohibited by Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) (Title VII), and the New Mexico Human Rights Act, NMSA 1978 § 28-1-7 (NMHRA). (Doc. 1-1) at ¶¶ 17, 21. She also brought state law claims against the Plains Defendants and C3 for battery; slander and libel per se; intentional infliction of emotional distress; negligence; gross negligence; negligent hiring, training, retention, and supervision; and gross negligence of the employers. (*Id.*) at ¶¶ 18-20, 22, 23, 26-28.

Adams invokes the doctrines of vicarious liability, *respondeat superior*, and ratification to claim the Plains Defendants are liable for Carrithers's, Robertson's, and Arnault's conduct. (Doc. 1-1) at ¶¶ 24, 25. Adams also invokes the joint employer doctrine to claim that the Plains Defendants were her co-employer, along with C3, and are liable to Adams on her employment claims. (*Id.*) at ¶¶ 29-32. Put another way, Adams contends that C3 did not operate as an independent contractor for the Plains Defendants and that, in fact, Adams, Carrithers, Robertson, and Arnault were employed by the Plains Defendants due to the degree of control the Plains Defendants exercised over their work.

The Plains Defendants timely removed the case to federal court on October 3, 2018, based on federal question jurisdiction. (Doc. 1). On October 10, 2018, the Plains Defendants filed their Answer to Adams' Complaint. (Doc. 4). Contemporaneously to their Answer, the Plains Defendants filed their Motion, seeking summary judgment on all claims and asserting that C3, Carrithers, Robertson, Arnault, and Adams were, at all times, independent contractors and/or

vendors for whom the Plains Defendants cannot be held liable. (Doc. 6). The Plains Defendants attached their Master Services Agreement with C3 (Doc. 7-4), as well as affidavits from Kenneth Benton, Vice President of Engineering for Frontier Energy Services, LLC[1], who was responsible for overseeing the overall construction of the pipeline project at issue and managing the subcontractors (Doc. 7-1); Jason Pottridge, formerly the Construction Manager for Frontier Energy Services, LLC, and a contract construction manager and inspector for Renegade Gas Services, LLC, another subcontractor on the pipeline project (Doc. 7-2); and Patrick James "P.J." Radtke, a contract construction manager on the project who provided work orders and construction specifications to other subcontractors (Doc. 7-3). All three affiants state that neither the Plains Defendants nor the independent contractor inspectors or construction managers had the authority to manage, supervise, or direct the subcontractors' employees. (Doc. 7-1) at ¶¶ 20, 22-24, 29, 35-39 ; (Doc. 7-2) at ¶¶ 16-18, 24-28 ; (Doc. 7-3) at ¶¶ 15, 16-18, 24.

Adams opposes the Motion and submitted her own affidavit, stating the harassment at issue took place on the jobsite, that she "repeatedly alerted various representatives and management of" the Plains Defendants about the harassment, including "Casey," "Dave," "Tyler," and "Blake." (Doc. 13) at 18, ¶¶ 9-10. Adams further states that "[n]o one at [the Plains Defendants] did anything to stop the abuse" and instead "they" told her to get back to work. (*Id.*) at 18, ¶ 11. Finally, Adams alleges that the Plains Defendants "acted like they were my bosses by often giving me specific instructions on how and when to do my job." (*Id.*) at 18, ¶ 13. Alternatively, Adams submitted a Rule 56(d) affidavit from her attorney stating that allowing discovery would give Adams "the opportunity to gather additional evidence to further

---

[1] Frontier Energy Services, LLC managed the construction of the pipeline on behalf of the Plains Defendants. (Doc. 7) at 3 (UMF 9); (Doc. 13) at 6 (admitting UMF 9).

develop genuine issues of material fact" and that she "would propound written discovery and set depositions for multiple topics," to include the relationships between the defendants, actions of the defendants in determining the terms and conditions of Adams' employment and general employment on the jobsite, ownership of the jobsite, defendants' knowledge of Adams' complaints, and defendants' actions or inaction after learning of those complaints. (Doc. 13) at 22.

II.    Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "When applying this standard, [the Court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000) (internal quotation marks omitted). The movant bears the initial burden of showing the absence of a genuine issue of material fact, then the burden shifts to the non-movant to provide evidence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit, and "genuine" if a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999); *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted). A party cannot avoid summary judgment simply by resting upon the mere allegations or denials of its pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

Rule 56(d) allows for limited discovery in the face of a motion for summary judgment. Courts treat liberally the question of whether to grant a Rule 56(d) application under the

principle that summary judgment should be denied where the nonmoving party has not had the opportunity to discover facts at the heart of her opposition and where the application is not "dilatory or lacking in merit." *Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000). More specifically, narrow discovery may be permissible when the claim turns wholly or in part on a determinative factual question regarding which the court requires more facts to answer. *See Herrera v. Santa Fe Pub. Sch.*, 2012 WL 6846393, at *6 (D.N.M. 2012); *Todd v. Montoya*, 2011 WL 5238900, at *5 (D.N.M. 2011). A Rule 56(d) affidavit must "explain why facts precluding summary judgment cannot be presented," including an identification of probable facts that are not available and the steps taken to obtain those facts. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992).

III.    Discussion

The Plains Defendants argue that they are not liable for any acts or omissions of C3, Carrithers, Robertson, or Arnault. As to Adams' state law claims (*i.e.*, battery; slander and libel; intentional infliction of emotional distress; negligence; gross negligence; negligent hiring, training, and supervision; and grossly negligent hiring, training, and supervision) the Plains Defendants contend that they cannot be held vicariously liable because C3 and its employees were independent contractors – and not employees – of the Plains Defendants. As to Adams' Title VII and NMHRA claims (retaliation, discrimination, and *quid pro quo* sexual harassment), the Plains Defendants assert that they cannot be held liable because they were not Adams' employer or joint employer.

Adams argues that summary judgment is inappropriate because the Plains Defendants operated as an employer of all C3 employees, including Carrithers, Robertson, Arnault, and Adams. Adams also asserts a new claim for premises liability against the Plains Defendants,

which the Court construes as a motion to amend the Complaint. Alternatively, Adams requests that the Court delay ruling on or deny the Plains Defendants' Motion and grant Adams time to conduct discovery.

Because Adams submitted a substantive response to the Plains Defendants' Motion as well as a Rule 56(d) affidavit, the Court first addresses the substantive Motion and response, and then considers the sufficiency of Adams' Rule 56(d) affidavit.

1. *Joint Employer Status under Title VII*

Title VII "makes it unlawful for an 'employer' to 'discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment' on account of sex." *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014) (quoting 42 U.S.C. § 2000e-2(a)(1)). Similarly, an employer "may not 'discriminate against any of his [or her] employees . . . because [the employee] has opposed any [unlawful employment] practice.'" *Id.* (quoting 42 U.S.C. § 2000e-3(a)).

Adams bears the initial burden of proving the Plains Defendants were her employer before proceeding with a Title VII claim. *Id.*; *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998). Depending on the circumstances, the Tenth Circuit chooses among three tests when determining whether a defendant is an "employer": (1) the hybrid test, (2) the joint employer test, and (3) the single employer test. *Knitter*, 758 F.3d at 1225-26. The hybrid test applies when distinguishing between an employee and an independent contractor. *Id.* at 1226; *see also Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir. 1992). The joint employer test is appropriate "to use when an employee of one entity seeks to hold another entity liable as an employer." *Knitter*, 758 F.3d at 1226; *see also Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc). Finally, the single employer test

applies when a plaintiff employed by one entity seeks "to hold another entity liable by arguing that the two entities effectively constitute a single employer." *Knitter*, 758 F.3d at 1227 (quoting *Bristol*, 312 F.3d at 1218).

Adams, appropriately, invoked the joint employer test and admits that she was employed by C3, but seeks to hold the Plains Defendants liable as her employer. Under this test, "two entities are considered joint employers if they 'share or co-determine those matters governing the essential terms and conditions of employment.'" *Id.* at 1226 (quoting *Bristol*, 312 F.3d at 1218).

"Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances . . . ." *Bristol*, 312 F.3d at 1219. However, additional factors courts consider when evaluating control under the joint employer test "include the ability to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; . . . day-to-day supervision of employees, including employee discipline; and . . . control of employee records, including payroll, insurances, taxes and the like." *Knitter*, 758 F.3d at 1226 (quotation omitted).

Considering the facts in the light most favorable to Adams, no reasonable jury could find that the Plains Defendants were Adams' employer. The Plains Defendants have shown a lack of evidence from which a reasonable jury could conclude that the Plains Defendants and C3 "share[d] or codetermine[d] those matters governing the essential terms and conditions of [Adams'] employment." *Bristol*, 312 F.3d at 1218; *see also Lockard*, 162 F.3d at 1069 (stating plaintiff has burden to prove defendant was her employer).

The following shows that the Plains Defendants (1) did not have the authority to terminate Adams' employment; (2) did not pay Adams directly; and (3) did not have the authority to supervise and discipline Adams beyond the confines of a vendor-client relationship.

Taking these factors together, the Court concludes that Adams was a vendor or the employee of a vendor providing a service rather than an employee of the Plains Defendants.

a. *Authority to Terminate*

In determining whether the Plains Defendants had the authority to terminate Adams' employment, the Court considers the affidavits of Kenneth Benton, who oversaw the overall construction of the 515-mile pipeline project on behalf of the Plains Defendants (Doc. 7-1); Jason Pottridge, who worked as a contract inspector, contract construction manager, and ultimately a construction manager for the Plains Defendants on the pipeline project (Doc. 7-2); Patrick James "P.J." Radtke, an independent contractor who worked as a construction manager on the project (Doc. 7-3); and Adams (Doc. 13) at 17-19. Benton averred that the Plains Defendants "had no authority or right to hire, retain, fire, discipline, or otherwise manage the employees of the pipeline contractors," including C3. (Doc. 7-1) at ¶¶ 39-40. Pottridge stated that, as a contract inspector on the project, he "had no ability to hire or fire the employees of the pipeline contractors," including C3. (Doc. 7-2) at ¶ 17. Similarly, Radtke stated as an independent contractor construction manager, he "had no ability to hire or fire the employees of the pipeline contractors," including C3. (Doc. 7-3) at ¶ 17. Adams' affidavit does not contradict these statements. Instead, Adams states that the Plains Defendants – without specifying who – "acted like they were my bosses." (Doc. 13) at 18, ¶ 13. Adams made no other assertions with respect to the Plains Defendants' ability to fire her.

Considering these affidavits together, the Court concludes that Adams' sole, conclusory statement regarding the behavior of the Plains Defendants as a whole, without any information regarding an ability to terminate her employment, is too vague to raise more than a scintilla of doubt with respect to this factor.

Even though the ability to terminate may not be the sole factor to consider under the joint employer test, it is particularly compelling in this case and weighs heavily against Adams. Notably, Adams does not assert any facts or make any argument regarding how the Plains Defendants were able to fire her. No reasonable jury could find the Plains Defendants had the ability to terminate Adams' employment.

The Court finds no genuine dispute that control over the most important condition of Adams' employment under the joint employer test—the ability to terminate her employment— did not lay with the Plains Defendants. Indeed, the Plains Defendants did not share in this power as a joint employer.

    b. *Payment and Benefits*

While the ability to terminate an employee remains the most important factor indicating a joint employer relationship, courts also consider whether the purportedly joint employer had control over the plaintiff's "records, including payroll, insurances, taxes and the like." *Knitter*, 758 F.3d at 1229 (quotation omitted).

Benton's affidavit makes clear that the Plains Defendants did not pay "salaries, wages, retirement benefits, employment taxes, social security taxes, and other benefits earned by" employees of the pipeline contractors, including C3. (Doc. 7-1) at ¶¶ 35, 38. Rather, the Plains Defendants paid the pipeline contractors pursuant to terms set by the Master Service Agreement between the Plains Defendants and the contractor. (Id.) at ¶ 33.

Adams' affidavit made no allegations and presented no evidence suggesting that the Plains Defendants controlled her personnel records, payment, taxes, benefits, insurance, or other records. Indeed, Adams does not allege that the Plains Defendants had any control over her

payment or benefits, nor that the Plains Defendants were ever responsible for her payment or benefits.

Viewing the facts in the light most favorable to Adams, no reasonable jury could conclude that the Plains Defendants shared control over Adams' payment and personnel file or other benefits. This factor, too, weighs heavily against Adams' position.

c. *Authority to Supervise and Discipline*

Courts also look to "day-to-day supervision of employees, including employee discipline," as a factor when evaluating joint employer status. *Knitter*, 758 F.3d at 1229-30 (quotation omitted). "Some degree of supervision and even discipline is to be expected when a vendor's employee comes on another business's work site, but the limited supervision and discipline here weigh against regarding" the Plains Defendants as Adams' joint employer. *Id.* at 1230.

Adams alleges the Plains Defendants supervised her work on a daily basis because they "constantly had supervisors and inspectors on site supervising the activities, the jobs, and the work being performed by employees of C3." (Doc. 1-1) at ¶ 30. Furthermore, Adams alleges the Plains Defendants "set the hours that Adams, her supervisors, and coworkers began the work and ended the work each day;" "regularly sent [their] representatives to the job where . . . Adams was working to inspect the job progress and to discuss other job prospects with C3 Pipeline." (*Id.*) at ¶¶ 30, 31. Adams says she

> believed that the supervisors from [the Plains Defendants] were her bosses
> because her supervisors at C3 had told her that the supervisors from [the Plains
> Defendants] were 'the bosses' of the C3 crew because the work that C3 was
> performing was for [the Plains Defendants] and subject to the instruction,
> supervision, design, and control of [the Plains Defendants].

(*Id.*) at ¶ 32.

In her affidavit, Adams included new factual allegations, specifically:

[The Plains Defendants] acted like they were my bosses by often giving me specific instructions on how and when to do my job. [The Plains Defendants] and [their] inspectors regularly told us that we had to work Sundays, holidays and overtime. They often gave me detailed directives about my work. [The Plains Defendants] were so picky about how I did my job, I felt like they were bullying me as the only woman on the job site. For example, my job sometimes involved digging and we would often encounter caliche in the dirt. More than once, a [Plains Defendant] inspector gave me detailed commands on how to break up and remove the caliche including what tools to use. [The Plains Defendants] also stopped my work and told me how [the Plains Defendants] wanted me to off-load pipe from trucks including directions on using clamps, straps and knots. [The Plains Defendants] inspectors told me how to perform coding and once checked and controlled the coarseness of grit on my sandpaper. Many of the detailed instructions from the inspectors had no relationship to safety. The inspectors would walk around and tell us what specific tasks we had to finish and what part of the project we were going to work on next. One time, either Blake or Ron instructed me to get out of the ditch I was in and told me I had to move an individual rock. I was mad and felt like I was being picked on for no reason and kicked the rock away with my foot. Another time, Blake told me I had to move my truck. He stated I could leave the job site if I didn't move it.

(Doc. 13) at 18-19. Adams does not directly allege that the Plains Defendants had any authority to or actually did discipline her.

Benton states that the pipeline contractors, including C3, "were solely responsible for the management and discipline of the personnel that the contractor hired to perform work on the project." (Doc. 7-1) at ¶ 36. Pottridge avers that his job as a contract inspector required him to "be on site at the various job locations . . . to make sure that the contractors used the correct materials and that the work that they performed met the specifications listed in the work orders"; that he "did not manage, supervise, or direct the work of the employees of the pipeline contractors"; and "had no ability to hire or fire the employees of the pipeline contractors." (Doc. 7-2) at ¶¶ 13, 15, 17. When Pottridge became an employed construction manager, his job duties "included providing work orders and construction specifications to pipeline contractors . . . [and] managing the construction timeline for the Project"; but that he "did not manage, supervise, or

direct the work of the employees of the pipeline contractors," and "had no ability to hire or fire" those employees. (*Id.*) at ¶¶ 22, 25, 27. Similarly, Radtke states in his Affidavit that, in his capacity as a contract construction manager, he "had no ability to hire or fire the employees of the pipeline contractors" and "did not direct C3 employees when to arrive for work or when they could leave a job site[, and] did not hire, fire, train, supervise, consult with, manage, discipline or direct any C3 employees." (Doc. 7-3) at ¶¶ 17, 24.

This level of claimed supervision most closely resembles a vendor-client relationship, similar to that described in *Knitter*. In *Knitter*, defendant's supervision of the plaintiff's work was "limited and largely focused on workplace safety issues. . . . Because the [plaintiff] worked on [defendant's] premises, [defendant] naturally would be concerned about their safety, even if only for liability purposes, just as they would for any employee or non-employee on premises." 758 F.3d at 1230. Furthermore, much like the defendant in *Knitter*, the Plains Defendants' alleged supervision "was limited to directing [Adams] on how to perform certain tasks to its satisfaction, much like an individual hiring a moving company to move his or her belongings into an apartment might direct the movers on where to place items or how to protect items that are particularly fragile." *Id.* at 1230.

Based on the facts presented, no reasonable jury could conclude that the Plains Defendants had the authority to supervise and discipline Adams as an employee.

### d. *The Plains Defendants were not Adams' Joint Employer*

The modicum of control that the Plains Defendants may have exerted over Adams' daily work, including supervision and discipline, does not suffice to render the Plains Defendants her joint employer for Title VII purposes. Taking together the "essential terms and conditions of employment," including the authority to terminate, pay, supervise, and discipline, the Court

concludes the Plains Defendants did not exert sufficient control over these matters to be Adams' joint employer. *Bristol*, 312 F.3d at 1218; *Knitter*, 758 F.3d at 1226-30. The most important factor, the Plains Defendants' inability to terminate or fire Adams, weighs heavily against the Plains Defendants being Adams' joint employer, as does the fact that the Plains Defendants did not pay her. *Bristol*, 312 F.3d at 1219. The remaining factors also weigh against finding the Plains Defendants to be Adams' joint employer, as they had, at most, limited authority to supervise elements of Adams' work and had no authority to discipline her. Thus, a reasonable jury could not find that the Plains Defendants were Adams' joint employer.

C3 was a vendor – an independent contractor – and the Plains Defendants were clients. The Plains Defendants exerted the sort of control over C3's employees that one would expect a client to exert over its vendors, including supervising limited aspects of the work and providing instruction on particular tasks. *Knitter*, 758 F.3d at 1231.

The uncontroverted affidavits submitted by the Plains Defendants establish that the Plains Defendants regularly used dozens of independent contractors, or vendors, during the daily operations on the pipeline project. These vendors, however, are not converted into the Plains Defendants' employees merely because the Plains Defendants notified them regarding which services were desired and required compliance with safety rules. The Plains Defendants were not Adams' joint employer for purposes of Title VII. As such, the Plains Defendants are entitled to summary judgment on Adams' Title VII claims.

2. *Independent Contractor Status under New Mexico Law*

Adams' state law claims turn on whether Adams, Carrithers, Robertson, and Arnault, or any of them individually, are considered employees of the Plains Defendants rather than independent contractors under New Mexico law. As explained below, Adams, Carrithers,

Robertson, and Arnault are properly considered independent contractors of the Plains Defendants, and not employees.

"New Mexico courts have employed an agency analysis to determine whether an individual is acting as an independent contractor or as an employee." *Celaya v. Hall*, 2004-NMSC-005, ¶ 11, 85 P.3d 239. New Mexico courts adopted the *Restatement (Second) of Agency* (Restatement) § 220 to aid in this analysis. *Id.* at ¶ 14. Thus, New Mexico evaluates the degree of control the principal exercises over the details of the agent's work, and several other factors, when determining whether an individual acts as an employee or independent contractor. *Id.* at ¶ 15. These factors include:

> 1) the type of occupation and whether it is usually performed without supervision; 2) the skill required for the occupation; 3) whether the employer supplies the instrumentalities or tools for the person doing the work; 4) the length of time the person is employed; 5) the method of payment, whether by time or job; 6) whether the work is part of the regular business of the employer; 7) whether the parties intended to create an employment relationship; and 8) whether the principal is engaged in business.

*Id.* Ultimately, New Mexico engages in a "totality of the circumstances" analysis. *Id.* (quoting *Harger v. Structural Servs., Inc.*, 1996-NMSC-018, ¶ 26, 916 P.2d 1324).

The degree of control analysis, discussed *supra* in Subsection 1, equally applies to the independent contractor analysis. The Court declines to restate that analysis herein, but notes that the degree of control weighs in favor of finding the C3 employees to be independent contractors, rather than employees of the Plains Defendants.

The parties submitted no information regarding whether a pipelayer or other tasks performed by Adams, Carrithers, Robertson, and/or Arnault usually are performed without supervision, and no information with respect to the skill required. As such, these factors do not weigh in favor of or against either party.

Adams does not allege that the Plains Defendants supplied the instrumentalities or tools for the C3 employees. Indeed, Benton states that C3 and other pipeline contractors "were responsible for supplying their employees with all tools and equipment necessary to perform the work set forth in the construction specifications." (Doc. 7-1) at ¶ 24. In this regard, Pottridge and Radtke assert substantially the same. (Doc. 7-2) at ¶¶ 18 and 28; (Doc. 7-3) at ¶ 18. This factor, therefore, weighs in favor of finding the C3 employees to be independent contractors, rather than employees, of the Plains Defendants.

The next factor, the length of time these individuals were employed, weighs in favor of finding Adams to be an independent contractor for the Plains Defendants. According to Adams, she worked for C3 in 2015 and 2016. (Doc. 1-1) at ¶ 14. She spent part of that time in Hobbs, New Mexico, presumably working on the Alpha Crude Connector project, and part of that time working on another C3 project in Ohio. (Doc. 1-1) at 17 (Charge of Discrimination filed by Adams against C3). While not directly speaking to length of employment, Adams movement between job sites while working for C3 suggests that she was employed by C3 but an independent contractor on each job site.

The parties submitted no information with respect to Carrithers', Robertson's, or Arnault's tenure at the Alpha Crude Connector project. Accordingly, this factor is neutral with respect to Carrithers, Robertson, and Arnault.

As for method of payment, discussed above, the Plains Defendants paid C3 a predetermined amount based on the Master Services Agreement and did not directly pay any of C3's employees. Accordingly, this factor weighs in favor of finding Adams, Carrithers, Robertson, and Arnault to be independent contractors of the Plains Defendants.

The evidence suggests that the Plains Defendants own the pipeline project and the ultimate pipeline, but did not, themselves, construct the pipeline. This factor, therefore, weighs in favor of the Plains Defendants.

Adams does not allege that she intended to work for the Plains Defendants or to create an employment relationship with them. The parties presented no evidence with respect to Carrithers', Robertson's, and Arnault's intentions for creating an employment relationship with the Plains Defendants. Based on this lack of evidence, this factor weighs in favor of finding the four C3 employees to be independent contractors of the Plains Defendants. Finally, the Plains Defendants are engaged in business.

Considering all the factors in the *Restatement*, as adopted in *Celaya*, no reasonable jury could find that the Plains Defendants were Adams', Carrithers', Robertson's, or Arnault's "employer." 2004-NMSC-005, at ¶ 14, 85 P.3d 239. Put another way, Adams, Carrithers, Robertson, and Arnault were independent contractors for the Plains Defendants.

The Plains Defendants did not employ Adams. Therefore, they cannot be held liable for discrimination or retaliatory employment practices under the NMHRA. *See* NMSA 1978 § 28-1-7 (authorizing liability against "employer" for discriminating or retaliating against employee); *see also Fierra v. Mesa Verde Enterprises, Inc.*, 244 F. Supp. 3d 1153, 1162 (D.N.M. 2007) (noting NMHRA prohibits "an employer from discriminating against an employee").[2]

---

[2] New Mexico law defines "employer" as "any person employing four or more persons and any person acting for an employer." NMSA 1978, § 28-1-2(B). New Mexico case law does not further clarify this term in the NMHRA context. As such, the Court turns to New Mexico law analyzing the employment relationship in other contexts and reiterates the above analysis to conclude that the Plains Defendants were not Adams' "employer" within the meaning of the NMHRA.

As a general principle, "an employer is not responsible for the acts of an independent contractor." *Saiz v. Belen School Dist.*, 1992-NMSC-018, ¶¶ 7, 10, 827 P.2d 102. This rule does not apply when the employer has a nondelegable duty "(1) arising out of some relation toward the public or the particular plaintiff . . . or (2) because of work that is specially, peculiarly, or inherently dangerous," Adams does not assert, however, that this public policy exception applies here. *Id.* at ¶ 10. Though not specifically addressed by Adams, the Court concludes that Adams' claims do not arise out of some relation of the Plains Defendants toward Adams in particular, nor do they arise because the work at issue is peculiarly dangerous. As such, the public policy exception does not apply. Employers cannot be held responsible for the acts of an independent contractor, and no exception to this rule applies in this case. The Plains Defendants cannot be held liable for the actions of C3, Carrithers, Robertson, or Arnault. The Plains Defendants are entitled to summary judgment on all of Adams' state law claims.

3. *New Claim Asserted in Response to Motion for Summary Judgment*

Adams raises a state-law claim for premises liability for the first time in her Response. (Doc. 13) at 9. An issue raised for the first time in response to a motion for summary judgment may be considered a request to amend the complaint. Fed. R. Civ. P. 15; *Rowley v. Morant*, 631 F. Appx. 651, 655 (10th Cir. 2015); *see also Pater v. City of Casper*, 646 F.3d 1290, 1299 (10th Cir. 2011) (applying same standard to issues raised in motion for summary judgment).

The Tenth Circuit explains,

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.

*Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365-66 (10th Cir. 1993) (citations omitted). As a general rule, plaintiffs should not be barred from pursuing a claim simply because that claim did not appear in the initial complaint. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991). However, district courts have considerable discretion when evaluating motions to amend under Rule 15. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204-05 (10th Cir. 2006).

A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason, including that the amendment would not survive a dispositive motion such as a motion to dismiss for failure to state a claim upon which relief can be granted. *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999). Additionally, "[u]ntimeliness alone is a sufficient reason to deny leave to amend . . . when the party filing the motion has no adequate explanation for the delay." *Frank*, 3 F.3d at 1365-66.

In deciding whether a claim is subject to dismissal for failure to state a claim upon which relief can be granted, the Court must accept all well-pleaded allegations as true and must view them in the light most favorable to the plaintiff. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984). Rule 12(b)(6) requires that a complaint set forth the grounds of a plaintiff's entitlement to relief through more than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a plausible claim of relief. *Id.* at 570. A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In New Mexico, a premises liability claim "is not limited to injuries occurring on the defendant's property." *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 10, 310 P.3d 611 (citing *Bober v. N.M. State Fair*, 1991-NMSC-031, ¶ 27, 808 P.2d 614). Furthermore, the claim is "not limited to injuries resulting from a physical defect on the premises." *Id.*; *see also Callaway v. N.M. Dep't of Corr.*, 1994-NMCA-049, ¶ 17, 875 P.2d 393 (noting New Mexico Supreme Court's rejection of narrow "physical defect" standard); *Coca v. Arceo*, 1962-NMSC-169, ¶¶ 2, 19, 376 P.2d 970 (reversing summary judgment for defendant where plaintiff alleged that owners of bar should have protected plaintiff from battery by another patron). Indeed, premises liability extends to "safety policies necessary to protect the people who use the [premises]." *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 9, 141 P.3d 1259 (explaining that New Mexico Tort Claims immunity waiver "applies to more than the operation or maintenance of the physical aspects of the building"); *see also Encinias*, 2013-NMSC-045, ¶ 10 (analogizing common-law premises liability with New Mexico Tort Claims waiver for premises liability).

The landscape changes substantially when considering employees of independent contractors. Generally, "the employer of an independent contractor is not liable for injuries to an employee of the independent contractor." *Sherman v. Cimarex Energy Co.*, 2014-NMCA-026, ¶ 8, 318 P.3d 729 (quoting *Valdez v. Cillessen & Son, Inc.*, 1987-NMSC-015, ¶ 21, 734 P.2d 1258). There are two exceptional situations however: 1) "where the employer controls the premises on which the work is being performed", and 2) "where the employer retains control over the independent contractor's performance of its work." *Id.* (citing *Pollard v. Westinghouse*

*Elec. Corp.*, 1995-NMCA-038, ¶ 6, 895 P.2d 683. In either situation, "an employer of contractors on a jobsite has a duty of reasonable care to protect persons on the premises from unreasonably dangerous conditions, including employees of those contractors." *Hinger v. Parker & Parsley Petroleum Co.*, 1995-NMCA-069, ¶ 22, 902 P.2d 1033. With respect to employees of a subcontractor working on the premises, however, this duty is not absolute. *Requarth v. Brophy*, 1990-NMCA-116, ¶ 10, 801 P.2d 121. "Absent control over the job location or direction of the manner in which the delegated tasks are carried out, the general contractor is not liable for injuries to employees of the subcontractor resulting from either the condition of the premises or the manner in which the work is performed." *Fresquez v. Sw. Indus. Contractors & Riggers, Inc.*, 1976-NMCA-090, ¶ 31, 554 P.2d 986. The general contractor's or project owner's "general control over the premises is not, in most instances, sufficient to subject the [general contractor or owner] to liability if the employee's injury resulted from a hazard created by an independent contractor unknown to" the general contractor or owner. *Requarth*, 1990-NMCA-116, ¶ 11.

To succeed, Adams must show that the Plains Defendants "retained at least some specific control over the premises during the performance of the work, or over the instrumentality that proximately caused [her] injury." *Id.* at ¶ 12. She must also show that her injury

> was proximately caused by the [Plains Defendants'] failure to exercise that control in a reasonable manner, that the [Plains Defendants] knew or by the exercise of reasonable care should have discovered the dangerous condition, that such hazard involved an unreasonable risk of harm to plaintiff, and the [Plains Defendants] should have expected that the employee would not discover or realize the danger, or would fail to protect [her]self against it."

*Id.*

Adams alleges that "[o]n many occasions, the compelled sexual acts and harassment took place on the [Plains Defendants'] jobsite." (Doc. 13) at 18, ¶ 9. Adams further states that she

"alerted various representatives and management of C3 [and the Plains Defendants] about [the] mistreatment," including "Casey," "Dave," "Tyler," and "Blake." *Id.* at ¶ 10. Adams does not, however, allege for which company these individuals worked.[3] Put another way, Adams does not allege that she told someone specifically from the Plains Defendants. Rather she only alleges she told four people who may have been employed by either C3 or the Plains Defendants. This allegation is not sufficient.

Moreover, Adams does not allege how the sexual harassment by her direct supervisors, also C3 employees, "was proximately caused" by the Plains Defendants' failure to exercise control over the jobsite in a reasonable manner. Adams also does not allege facts sufficient to infer that the Plains Defendants "should have expected" that Adams would not discover or realize the danger, or would fail to protect herself against it. *Requarth*, 1990-NMCA-116, ¶ 12. Accordingly, Adams failed to state a claim for premises liability and the Court denies her implicit motion to amend the Complaint.

### 4. *Rule 56(d) Affidavit*

"When a party files an affidavit under Rule 56(f) for additional discovery time, the party invokes the trial court's discretion."[4] *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1553-54 (10th Cir. 1993). "In this circuit, a party seeking to defer a ruling on summary judgment under Rule 56(f) must provide an affidavit 'explaining why facts precluding summary judgment cannot be presented.'" *Valley Forge Ins. Co. v. Health Care Management Partners,*

---

[3] Adams does allege that "Casey" worked for the Plains Defendants, but Pottridge states that the only "Casey" he knew was an assistant office administrator and not a manager. (Doc. 7-2) at ¶¶ 46-48.

[4] Rule 56(f) is the precursor to Rule 56(d). Rule 56 was restyled in 2010. Committee notes state "[Rule 56] subdivision (d) carries forward without substantial change the provisions of former subdivision (f)."

*Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (alterations omitted) (quoting *Campbell*, 962 F.2d at 1522). "This includes identifying (1) 'the probable facts not available,' (2) why those facts cannot be presented currently, (3) 'what steps have been taken to obtain these facts,' and (4) 'how additional time will enable the party to' obtain those facts and rebut the motion for summary judgment." *Id.* (alterations omitted) (quoting *Campbell*, 962 F.2d at 1522). "Rule 56(f) is not a license for a fishing expedition." *Lewis v. Ft. Collins*, 903 F.2d 752, 759 (10th Cir. 1990).

Adams' Rule 56(d) affidavit falls short of this standard. Although the affidavit lists multiple topics on which Adams would propound written discovery and would take depositions, she does not identify any "probable facts not available." Furthermore, the proposed deposition topics and discovery are very broad in response to a relatively narrow issue, that is, whether Adams, Carrithers, Robertson, and/or Arnault can properly be considered "employees" of the Plains Defendants. Adams' proposed topics for discovery do not address the employment status of Carrithers, Robertson, or Arnault. Adams' Rule 56(d) affidavit fails to provide a description of the particular discovery needed or an explanation of how that discovery would preclude summary judgment. *Hackworth v. Progressive Ins. Co.*, 468 F.3d 722, 732-33 (10th Cir. 2006), *cert. denied*, 550 U.S. 969 (2007).

IV.  <u>Conclusion</u>

For the reasons stated above, the Court concludes that the Plains Defendants did not "employ" Adams, Carrithers, Robertson, or Arnault for Title VII or state law purposes. The Plains Defendants cannot be held vicariously liable for actions of their independent contractors. Further, Adams' Rule 56(d) affidavit fails to establish why the requested discovery would preclude summary judgment, and fails to establish entitlement to relief. Finally, Adams' implicit

23

motion to amend her Complaint is futile because it fails to state a cause of action against the Plains Defendants.

IT IS, THEREFORE, ORDERED THAT

1. The Plains Defendants Motion for Summary Judgment, filed October 10, 2018 (Doc. 6), is granted;

2. Plaintiff Jessica Adams' Rule 56(d) request for additional discovery (Doc. 13) is denied;

3. Plaintiff Jessica Adams' implicit Rule 15 motion to amend the Complaint (Doc. 13) is denied; and

4. All claims against the Plains Defendants are dismissed with prejudice and judgment shall enter in favor of the Plains Defendants.

_____
UNITED STATES DISTRICT JUDGE